1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10    RICKY HAMMONDS,

11                Plaintiff,                        No. 2:09-cv-0920 FCD KJN P

12           vs.                                    FINDINGS AND RECOMMENDATIONS

13    R. HAMPTON, et al.,

14                Defendants,

15    _____/

16    I.      Introduction

17                Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to

18    42 U.S.C. § 1983.  Pending before the court are cross-motions for summary judgment by plaintiff

19    (Dkt. No. 16) and by defendants Hampton and Swett (Dkt. No. 21).  Defendants filed an

20    opposition to the plaintiff's motion for summary judgment on February 18, 2010.  (Dkt. No 21.)

21    Plaintiff filed an opposition to defendants' cross-motion on March 4, 2010.  (Dkt. No. 24.)

22    Plaintiff filed a reply to defendants' opposition on March 1, 2010.  (Dkt. No. 23.)  Defendants

23    filed their reply to plaintiff's opposition on March 23, 2010.  (Dkt. No. 28.)

24    ////

25    ////

26    ////

1

II.    Allegations

This case is proceeding on the original complaint (Compl.), filed April 3, 2009. (Dkt No. 1.)  Plaintiff alleges that Hampton and Swett were deliberately indifferent to his serious medical needs because they delayed and denied him access to medical treatment.  (Id.)

Plaintiff's complaint contains the following allegations:  Plaintiff alleges that on May 21, 2006, at California State Prison Sacramento ("CSP-Sac"), about 10:00 a.m., he began experiencing dizzy spells, shortness of breath and difficulty breathing.  Plaintiff attempted to get the tower officer's attention, to no avail.  At some point thereafter, plaintiff allegedly fainted and hit his head on the floor.  He again attempted to gain the tower guard's attention without success. Plaintiff then started blocking off his windows to get an officer to respond.  Defendant Hammond came to count plaintiff at 11:00 a.m., and plaintiff advised Hammond of his efforts to gain medical attention.  Hammond allegedly told plaintiff he could "go down to the gate at next yard." (Compl. at 4.)

When plaintiff's cell door opened, plaintiff exited the cell and allegedly fainted. Plaintiff alleges he was left laying on the tier until yard count was completed.  After awhile, two officers came and told plaintiff to get up and return to his cell and if he did not, they would pick him up and put him in his cell, which they did.  Then an R.N. came and asked plaintiff what was wrong.  Plaintiff allegedly told the R.N. of his shortness of breath, difficulty breathing, fainting three times and dizziness.  The R.N. took his vitals and gave him a hand/eye coordination test. Plaintiff alleges she told staff to bring a gurney or wheelchair, that plaintiff had an abnormal pulse and blood pressure, bump on the side of his face, and mouth droop, which could indicate a mild stroke.

Plaintiff alleges he was helped downstairs to wait for a wheelchair and, while sitting on a stool, he allegedly fainted and fell off the stool to the floor.  Plaintiff was then placed in a wheelchair, taken to clinic, where he was examined, given an EKG, ordered X rays for the next day and given pain medication.

III.     Motion for Summary Judgment

         Legal Standard for Summary Judgment

         Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56(c) is met.  "The judgment sought should be rendered if . . . there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

         Under summary judgment practice, the moving party
         always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id., citing Fed. R. Civ. P. 56(c).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

         If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . .  Where the record taken ////

1   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

2   'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

3          By order filed May 29, 2009, the court advised plaintiff of the requirements for

4   opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt.

5   No. 11); see Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v.

6   Eikenberry, 849 F.2d 409 (9th Cir. 1988).

7   IV.    Undisputed Facts

8          The following undisputed facts ("UDF")[1] are either not disputed by plaintiff or

9   defendants, or following the court's review of the evidence submitted have been deemed

10  undisputed:

11         At all relevant times, plaintiff was incarcerated at CSP-Sac.  UDF #1.  At all

12  relevant times, defendant Hampton was employed by the California Department of Corrections

13  and Rehabilitation ("CDCR") as a Correctional Officer ("CO"), and had been working at CSP-

14  Sac for ten years as of the date of the incidents alleged herein.  UDF #3.  On May 21, 2008,

15  Hampton was manning the floor of building C-2 at CSP-Sac, the building where plaintiff was

16  housed.  UDF #4.  C Facility-two block is a 180-degree design cell block with 64 cells on two

17  levels.

18         The block is separated into three sections referred to as A, B and C sections.

19  Section C has twelve cells on the top level and twelve cells on the bottom level.  The cells do not

20  have bars, but have a solid steel door.  Each cell has an approximate 5" x 38" window on the cell

21  door and a 6" x 38" window on the front wall of the cell.  The top level has a balcony-type

22  walkway called a "tier" which provides access to the upper-level cells.  The doors of each cell

23  ////

24  ────────────────────

25         [1]  Statements from defendants' statement of undisputed facts are noted by UDF - # (Dkt.
    No. 21-3), and those from plaintiff's statement of undisputed facts are noted by UDF - letter (#).
    The parenthetical listed thereafter is a reference to the number plaintiff initially assigned the
26  UDF.  (See Dkt. No. 21-4.)

open into the interior of the building.  The bottom level opens onto a large common area, and the top level opens onto the tier.  UDF #5.

The Control Booth is located in the center of the semicircle, opposite the cells, so that all cells can be seen in one view.  The Control Booth is approximately nine feet above ground level, and it is not accessible from anywhere inside the building.  It is enclosed in bullet-proof glass, and it has gun ports.  The Control Booth has a console with controls for each section that open and close the cell doors, and the building doors.  Generally, correctional officers manning the control booth provide gun coverage and monitor and control access and egress for staff and inmates to and from the building.  The Control Booth has an exterior window that opens to the exercise yard.  UDF #6.

Plaintiff claims that around 10:00 a.m. on May 21, 2008, he began to feel dizzy and short of breath.  He claims he flashed the lights in his cell on and off, and frantically gestured to get the attention of defendant Swett who was manning the Control Booth.  Plaintiff claims Swett saw him but only shrugged his shoulders and went on with his business.  UDF #7.  Plaintiff claims he laid down on his bunk, then got up again and fainted.  He clams he again frantically gestured to Swett in the Control Booth but Swett made a "brush-off" motion.  UDF #8.  Plaintiff covered his cell and door windows with paper.  This is called "boarding-up."  Plaintiff used a damp bar of soap as glue and stuck seven or eight sheets of paper to his windows, covering up both windows.  UDF #9.

Defendant Swett cannot recall any of the events of this incident on May 21, 2008.  UDF A (3).

At approximately 11:00 a.m. on May 21, 2008, defendant Hampton started the custody count prior to yard release.  Hampton usually starts the count on the top tier, and it takes approximately 10 to 15 minutes to complete the count.  Plaintiff's cell was near the center of the upper tier in C section.  Hampton arrived at plaintiff's cell door shortly after starting the count.  UDF #10.  "Boarding-up" is a rules violation because it prevents officers from seeing if the

1   inmate is in his cell or if he is engaged in illegal or self-destructive conduct.  Hampton ordered

2   plaintiff to uncover his windows, which plaintiff did.  UDF #11.  Plaintiff claims he told

3   Hampton that he was feeling dizzy, had chest pains, difficulty breathing, and had fainted.  UDF

4   #12.  Plaintiff claims that Hampton replied, "If you had the strength to board-up, you seem

5   alright to me."  Plaintiff claims Hampton also said that he could wait until yard release, go to the

6   gates, and "tell them you got a problem."  Then he walked away.  UDF #13.  During this verbal

7   exchange, plaintiff did not appear to Hampton to be experiencing any medical difficulties.

8   Hampton Decl. ¶ 6.

9           At the completion of the close custody count, the inmates were released to the

10  exercise yard.  Hampton left the building to stand at the outside door to search the inmates as

11  they exited the building to the yard.  Hampton Decl. ¶ 8.  Plaintiff claims that when his cell was

12  opened for yard release, he stepped out onto the tier and fainted.  Pl.'s Deposition ("Dep.")

13  32:14-33:8.  While Hampton was standing at the outside door, the officer in the Control Booth

14  called down to him from the exterior window and said that when plaintiff's door was opened for

15  yard release, he walked out of his cell and laid down on the tier.  Hampton Decl. ¶ 8.  It is very

16  common for inmates to lie down in an attempt to manipulate staff to get to the medical clinic.  It

17  is called going "man down."  Hampton Decl. ¶ 9; Bakewell Decl. ¶ 8; Hamkar Decl. ¶ 7.

18          In admissions and interrogatory responses, Hampton admits other inmates were

19  released and were walking over and around plaintiff as he laid on the tier.[2]  UDF B (13).

20  Generally, an officer who knows or has reason to know that the inmate is in need of immediate

21  medical care must take reasonable action to summon such medical care.  UDF B (14).  Defendant

22  Hampton admitted he has no training in diagnosis of medical problems.  UDF C (15).  Hampton

23  admitted that in his opinion plaintiff did not appear to be experiencing significant medical

24  problems.  UDF D (23).

25  _____

26          [2]  Plaintiff objects that Hampton's discovery responses were inconsistent.  However, the
    court has reviewed the responses and overrules plaintiff's objections.

1        Upon hearing that plaintiff was down, Hampton entered the building.  He saw two

2   officers approach plaintiff while he was lying on the tier and instruct him to get up and go into

3   his cell.  Plaintiff refused to get up off the tier, and the officers picked him up and placed him in

4   his cell.  UDF #19.  Although Hampton believed plaintiff was manipulating staff by going "man

5   down," he called for medical assistance to make sure plaintiff was not actually having a medical

6   emergency.  UDF #20.  Hampton also believed plaintiff was upset because he would [or] could

7   not be let out to his appointment when plaintiff wanted.  UDF E (16).

8        Licensed Vocational Nurse Asp arrived within a matter of minutes after the call.

9   She had come from her duties in the building next door.  Asp gave plaintiff a brief exam.  UDF

10   #21.  A wheelchair was summoned to the building because plaintiff claimed to have long-term

11   medical issues and dizziness.  When the wheelchair arrived at the building, plaintiff was taken to

12   the clinic.  UDF #23.[3]  Plaintiff claims he fainted a third time before the wheelchair arrived.  Pl.'s

13   Dep. 44:12-25.

14        The interdisciplinary progress notes indicate that plaintiff was seen at 12:00 noon

15   on May 21, 2008.  His blood pressure was 155/85 which is a bit high for the systolic number, but

16   not alarmingly so.  His heart rate was normal (86), as was his temperature (97.8).  His blood

17   oxygen content was tested by an oximeter and was normal (100%).  Plaintiff claimed he was

18   dizzy and short of breath since 10:30 a.m.  The examining medical staff noted that plaintiff's

19   pupils were equal and reactive to light ("PERL"), that he had an equal grip, and no ear drainage

20   or breaks to the skin.  Applying pressure to the skin showed his capillaries refilled in less than

21   three seconds of being pressed, which is normal.  There was sensation to all extremities.  His

22   lungs were clear and there was no head trauma.  Plaintiff was able to stand and walk toward staff.

23   At 12:30 p.m., plaintiff's sitting and standing blood pressure and heart rate were taken, and were

24   ////

25

26        [3] Defendants' Statement of Undisputed Facts does not include a UDF #22.

1  normal.  Bakewell Decl. at ¶¶ 2-3.  The initial tests and observations were all normal.  These tests

2  and observations also ruled out a stroke or heart attack.  Bakewell Decl. at ¶¶ 3-4.

3        The medical staff who examined plaintiff wrote the word "lying" at the top of the

4  page.  The medical staff disbelieved plaintiff's subjective complaints.  UDF #27.

5        The interdisciplinary progress notes indicate that Registered Nurse Bakewell saw

6  plaintiff at 1:00 p.m. on May 21, 2008.  She took his blood pressure and heart rate, which were

7  within normal limits.  Plaintiff's blood sugar level was 107, which is within normal limits, and

8  ruled out possible complications brought on by a drop in blood sugar.  Bakewell Decl. at ¶ 5.

9  Plaintiff  told Bakewell that he fell on a chair and passed out three times, that his face and head

10  hurt, and that he was having shortness of breath ("SOB").  He stated he had eaten three packages

11  of high-sodium soups back-to-back.  Bakewell Decl. at ¶ 6.  Bakewell did not see plaintiff having

12  difficulty breathing or lose consciousness at any time.  Bakewell Decl. at ¶ 6.

13        Objectively, Bakewell observed that plaintiff appeared awake, alert, and oriented

14  to person, place and time ("AAOX3").  She noted a slight droop to the right side of his mouth.

15  His grasp was equal and strong.  There was no jugular vein distention ("JVD").  His central

16  nervous system ("CVS") was grossly intact.  Using a stethoscope, she listened to his heart rate

17  rhythm ("HRR") and heart sounds ("S-1 S-2") which were normal, with no murmur noted.  She

18  was unable to see his ear drum due to impaction of cerumen ("ear wax").  He appeared to have a

19  seasonal cold with gross post nasal drip.  Bakewell Decl. at ¶ 7.  Nothing objectively indicated to

20  Bakewell that plaintiff had any loss of consciousness, syncopal episode, or suffered any acute

21  condition, such as a heart attack or stroke.  She assessed a syncopal episode based solely on

22  plaintiff's statement that he passed out three times.  Bakewell Decl. at ¶ 8.

23        Bakewell did not believe that plaintiff suffered a fainting ("syncopal") episode.

24  But as a precaution, she recommended an electrocardiogram ("EKG"), a complete blood count

25  ("CBC"), and a comprehensive metabolic panel ("CMP") to make sure plaintiff had no latent

26  ////

1   medical condition.  Bakewell Decl. at ¶ 8.  Plaintiff's EKG and CBC were normal.  Bakewell

2   Decl. at ¶ 8; Hamkar Decl. at ¶ 9.  Plaintiff was given Motrin for pain.[4]  Dkt. No. 21-7 at 5.

3                   Plaintiff had a series of tests to determine the cause of his purported syncope, all

4   of which were negative:

5           •      Normal vital signs and examination results on May 21, 2008

6           •      Normal EKG May 21, 2008

7           •      Normal comprehensive blood count and metabolic panel blood tests

8                  (collected June 3, 2008; results reported June 4, 2008)

9           •      Normal X-rays of skull, two views May 23, 2008

10          •      Normal CT scan of head August 29, 2008

11          •      Normal carotid artery evaluation August 29, 2008[5]

12          •      Normal echocardiogram October 20, 2008

13          •      Normal treadmill stress-test December 29, 2008

14          •      Normal MRI of the brain and auditory canals, March 6, 2009

15  Hamkar Decl. at ¶ 8.

16  ////

17  ////

18  _____

19      [4]  In plaintiff's UDFs 33 & 34, plaintiff insists he suffered pain to face and wrists,
    including an injury to his eye.  (See Dkt. No. 21-4 at 9.)  However, as defendants note, exhibits
20  provided by plaintiff (Dkt. No. 16 at 121-24) reflect that his complaints regarding facial pain, and
    numbness to hands and wrists, were reported on February 20, 2008, prior to the incident herein.
21  (Dkt. No. 16 at 121-23.)  Doctor's order for Benadryl issued on May 20, 2008, one day prior to
    the incident.  (Dkt. No. 16 at 124.)  Plaintiff's complaint does not mention an eye injury.  (Dkt.
22  No. 1, passim.)  The progress notes for care provided on May 21, 2008 also do not mention an
    eye injury.  (Dkt. No. 21-7 at 5.)  Nor do those progress notes reflect plaintiff complained of face
23  pain, or any pain, for that matter.  (Id.)  In his motion for summary judgment, plaintiff claims he
    experienced pain from hitting his head after fainting.  (Dkt. No. 16 at 9.)  Because Motrin was
24  prescribed for pain, one can infer plaintiff complained of some type of pain.

25      [5]  Although the report reflects an exam date of August 29, 2009 (Dkt. No. 21-7 at 15), this
    appears to be a typographical error.  The second page of the report reflects an examination date
26  of August 28, 2008, with a results date of August 31, 2008.  (Dkt. No. 21-7 at 16.)  Both pages
    are stamped with a "received" date of September 24, 2008.  Id.

No matter what the cause of the syncope, there is always some physiological indication that syncope has occurred.  If an episode of syncope occurred, one or more of the following physiological conditions will be present:

- abnormal blood pressure – in most cases abnormally low blood pressure;

- abnormal heart rate;

- abnormal oxygen level in the blood;

- abnormal blood sugar;

- gross dysfunction of the central nervous system which is evidenced by unequal pupil size, unequal grip strength, or lack of sensation to the extremities; or

- abnormal heart rhythm or valve sounds.

Hamkar Decl. at ¶ 5.

Plaintiff's exam results show none of the physiological indications of syncope were present within an hour after the purported syncope.  Hamkar Decl. at ¶ 6.  Plaintiff did not suffer syncope before or after the May 21, 2008 incidents.  UDF # 39.

Dr. Hamkar concluded that it is extremely unlikely, if not impossible, that plaintiff actually suffered syncope on May 21, 2008.  Hamkar Decl. at ¶ 7.  Based on plaintiff's normal results set forth above, Dr. Hamkar believes that plaintiff did not suffer any serious medical condition that needed immediate attention on May 21, 2008.  Hamkar Decl. at ¶ 8.

V.    Eighth Amendment Claim

Legal Standard

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 299

1  (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand).  The requisite state of

2  mind for a medical claim is "deliberate indifference."  Hudson v. McMillian, 503 U.S. 1, 6

3  (1992).

4          A serious medical need exists if the failure to treat a prisoner's condition could

5  result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

6  that a prisoner has a serious need for medical treatment are the following:  the existence of an

7  injury that a reasonable doctor or patient would find important and worthy of comment or

8  treatment; the presence of a medical condition that significantly affects an individual's daily

9  activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright,

10  900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-

11  01 (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on

12  other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

13          In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court defined a very

14  strict standard which a plaintiff must meet in order to establish "deliberate indifference."

15  Negligence is insufficient.  Farmer, 511 U.S. at 835.  Moreover, even civil recklessness (failure

16  to act in the face of an unjustifiably high risk of harm which is so obvious that it should be

17  known) is insufficient.  Id. at 836-37.  Nor is it sufficient that a reasonable person would have

18  known of the risk or that a defendant should have known of the risk.  Id. at 842.

19          "Deliberate indifference" is nothing less than recklessness in the criminal sense –

20  subjective standard – disregard of a risk of harm of which the actor is actually aware.  Id. at 837-

21  42.  "[T]he official must both be aware of facts from which the inference could be drawn that a

22  substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  Thus, a

23  defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and

24  disregards that risk by failing to take reasonable measures to abate it."  Id. at 847.  "[I]t is enough

25  that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."

26  ////

1    Id. at 842.  If the risk was obvious, the trier of fact may infer that a defendant knew of the risk.

2    Id. at 840-42.  However, obviousness per se will not impart knowledge as a matter of law.

3            Also significant to the analysis is the well established principle that mere

4    differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

5    Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Franklin v.

6    Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not fail to treat an

7    inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v. City of

8    Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical

9    condition, even if some treatment is prescribed, may constitute deliberate indifference in a

10   particular case.  Id.

11           Additionally, mere delay in medical treatment without more is insufficient to state

12   a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs,

13   766 F.2d 404, 407 (9th Cir. 1985).  Although the delay in medical treatment must be harmful,

14   there is no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060,

15   citing Wood, 900 F.2d at 1339-40.  A finding that an inmate was seriously harmed by the

16   defendant's action or inaction tends to provide additional support for a claim of deliberate

17   indifference; however, it does not end the inquiry.  McGuckin, 974 F.2d at 1060.  In summary,

18   "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's

19   actions in light of those needs, the more likely it is that a plaintiff has established deliberate

20   indifference on the part of the defendant."  Id. at 1061.

21           Analysis

22           Defendants have borne their initial responsibility by presenting Dr. Hamkar's

23   expert opinion summarized above.  The burden now shifts to plaintiff to establish the existence

24   of genuine issues of material fact requiring a trial.  As the party who will bear the burden of proof

25   at trial, plaintiff may not rely on the allegations of his complaint or on mere argument but must

26   provide evidence that demonstrates the existence of genuine issues as to material facts.

1    Plaintiff generally alleges that defendants were aware or should have been aware

2  that plaintiff suffered from a serious medical need, and thus were deliberately indifferent to his

3  serious medical need by failing to sound an alarm once plaintiff allegedly fainted.  Yet, plaintiff

4  has failed to establish the existence of any genuine issue of material fact with respect to this

5  claim.  As the undisputed facts demonstrate, defendants have provided the expert opinion of

6  Dr. Hamkar who opines plaintiff did not suffer from syncope on May 21, 2008.  Plaintiff has

7  failed to present any competent evidence to rebut this medical opinion.  Dr. Hamkar's opinion

8  bolsters defendant Hampton's view that plaintiff went "man down" to manipulate staff rather

9  than experiencing syncope.  Moreover, plaintiff has failed to rebut Dr. Hamkar's expert opinion

10  that "no matter what the cause of the syncope, there is always some physiological indication that

11  syncope has occurred."  Id.  The test results following plaintiff's presentation at clinic were all

12  within normal limits, and did not indicate plaintiff had experienced syncope.

13    Plaintiff seeks to rebut this evidence by claiming Dr. Menon's report demonstrates

14  his syncope was caused by the prescription Abilify, which plaintiff claims he was taking on

15  May 21, 2008.  Plaintiff also questions why defendants failed to obtain a declaration from

16  Dr. Ma, who was plaintiff's attending physician for over two years, who plaintiff alleges also told

17  him his syncopal episodes were attributed to Abilify.  (Dkt. No. 24 at 29.)  However, plaintiff

18  failed to explain why he did not submit a declaration from Dr. Ma supporting his own claim.

19  Plaintiff has provided no expert declarations from any doctor supporting plaintiff's position.  See

20  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).

21    Plaintiff also complains that Dr. Hamkar failed to review or analyze Dr. Menon's

22  report.  However, defendants are not required to produce all of plaintiff's medical records or to

23  make plaintiff's case for him.  If plaintiff felt Dr. Ma's or Dr. Menon's reports were relevant, it

24  was incumbent upon him to produce them and then seek a declaration from Dr. Menon,

25  Dr. Miles or Dr. Ma providing an expert opinion as to the cause of plaintiff's alleged syncope.  In

26  order to defeat a summary judgment motion, plaintiff must provide competent evidence to

14

1   support his claims, and demonstrate a material dispute of fact exists.  Plaintiff failed to present a

2   declaration by Dr. Ma, Dr. Miles or Dr. Menon expressing their professional opinion as to the

3   cause of the alleged syncope on May 21, 2008.

4           Instead, plaintiff provided a copy of an office visit report from an October 23,

5   2008 consultation with Dr. Peter Miles, Jr., in the cardiology department.  (Dkt. No. 24 at 91.)

6   The reason for the visit was "follow up with specialist" and the diagnoses were "syncope and

7   dyspnea and respiratory abnormalities."  (Id.)  The report included a letter addressed to

8   Dr. Prasanna Menon, who was an attending physician at California State Prison - Sacramento.

9   Plaintiff reported to Dr. Miles that he had suffered five episodes of syncope, which he said

10  started occurring six or seven months ago, all occurring within about a two-month period and

11  then resolved in May 2008.  (Dkt. No. 24 at 92.)  Dr. Miles noted plaintiff was on Abilify at the

12  time of the syncopal episodes, and that plaintiff had no syncopal spells since the Abilify was

13  discontinued.  (Id.)

14          However, Dr. Miles' assessment and plan states:

15          1.  Syncope.  [Plaintiff] has had approximately five episodes of
            syncope without clear etiology.  Symptoms are not consistent with
16          orthostasis or neurocardiogenic syncope.  Of interest, he was on
            Abilify throughout the time period where he had the syncopal
17          episodes and they appear to have resolved over the last few months
            since this medication was discontinued.  Abilify is known to cause
18          syncope and very likely may be the culprit.  Would recommend
            that he remain off this in the future.  His episodes of syncope
19          suggest possible arrhythmia as well, which could have been
            triggered by the medication.

20

21  (Dkt. No. 24 at 93.)  First, plaintiff's report of "approximately five episodes of syncope" does not

22  comport with plaintiff's deposition testimony where he stated he had not fainted before or since

23  May 21, 2008, the date on which he alleges he suffered only three episodes of syncope.  (UDF

24  #39.)  Second, Dr. Miles' use of terms such as "uncertain etiology," and "of interest," and "very

25  likely may be the culprit," does not definitively attribute plaintiff's syncope on May 21, 2008 to

26  Abilify.  (Dkt. No. 24 at 92.)

On March 12, 2009, plaintiff was again seen by Dr. Miles, who wrote a letter to plaintiff's attending physician, Dr. Ma.  (Dkt. No. 24 at 95.)  Dr. Miles' assessment and plan on this date states:

> 1.  Syncope.  [Plaintiff] had approximately five episodes of syncope last year with complete resolution over the last nine months.  It temporarily correlates with Abilify medication, which is associated with syncopal episodes.  Would recommend avoiding this in the future as it appears to be the cause.  If he develops any recurrent syncope off of the Abilify then would consider an event monitor at that time.

(Dkt. No. 24 at 95.)  This letter makes a more definitive connection between the Abilify and the episodes of syncope, but still includes the conditional language "it appears" to be the cause.  (Id.)  This report does not provide a declaration, under penalty of perjury, that Dr. Miles' professional opinion was that Abilify definitely caused plaintiff's alleged syncope on May 21, 2008.  Moreover, Dr. Miles' report is based solely on plaintiff's verbal report that he suffered five episodes of syncope.  Even though Dr. Miles may have reviewed plaintiff's complete medical file, Dr. Miles does not base his opinion, at least in this report, on any physiological test results confirming plaintiff sustained episodes of syncope on May 21, 2008.  Indeed, Dr. Miles states "[s]ymptoms are not consistent with orthostasis or neurocardiogenic syncope."  (Dkt. No. 24 at 93.)  Thus, plaintiff has failed to rebut Dr. Hamkar's expert opinion by competent evidence to the contrary.

But even assuming plaintiff did suffer from syncope on May 21, 2008, his claim fails.  Because plaintiff's symptoms were not based on any serious underlying medical illness, disease or other issue, but more likely a side effect of the medication Abilify, defendants Hampton and Swett could not have been aware of a serious medical need on May 21, 2008.  Plaintiff has failed to demonstrate that either Hampton or Swett were aware plaintiff was taking Abilify on May 21, 2008, or that either of them knew syncope was a possible side effect of Abilify.  To demonstrate deliberate indifference, plaintiff is required to show defendants disregarded a risk of harm known to each defendant.  Farmer, 511 U.S. at 837-42.  It is

1   undisputed that Hampton had no medical training.  When Hampton arrived at plaintiff's cell near

2   the beginning of cell count, plaintiff did not appear in distress to Hampton.[6]  And, later, Hampton

3   called for medical assistance, which arrived shortly after plaintiff was returned to his cell.  In his

4   deposition, plaintiff calculated that Nurse Asp came to the building 10 - 15 minutes after the two

5   officers came to pick him up off the tier.  (Dep. at 45:20-25.)  Plaintiff has also failed to

6   demonstrate Hampton was aware plaintiff might faint again.

7          Plaintiff's claims against defendant Swett are even more attenuated.  Plaintiff

8   alleges he attempted to gain Swett's attention by waving at Swett in the control tower and

9   flashing his lights.  Swett's responses were gestures in return.  Plaintiff provided no evidence that

10  Swett saw plaintiff allegedly faint in his cell.  Plaintiff has provided no further evidence to

11  demonstrate Swett was deliberately indifferent to a known serious medical need.

12         Moreover, the fact that medical staff who examined plaintiff wrote the word

13  "lying" at the top of plaintiff's chart bolsters defendants' beliefs that nothing was seriously

14  wrong with plaintiff, at least nothing that would require immediate medical attention.  In

15  addition, the medical tests performed returned normal results.

16         The above facts also support a finding that the delay plaintiff incurred prior to

17  receiving medical attention did not violate his Eighth Amendment rights.  Deliberate indifference

18  may be manifested by the intentional denial, delay, or interference with the plaintiff's medical

19  care.  See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Wakefield v. Thompson, 177 F.3d

20  1160, 1165 (9th Cir. 1999).  However, the defendant must purposefully ignore or fail to respond

21  to the plaintiff's pain or medical needs.  See McGuckin, 974 F.2d at 1060.  Thus, neither an

22  inadvertent failure to provide adequate medical care, nor mere negligence or medical

23  malpractice, nor a mere delay in medical care (without more), nor a difference of opinion over

24

25         [6]  Indeed, plaintiff did not appear ill to four different people who saw him on May 21,
    2008:  Hampton; Swett; the admitting nurse at clinic; and Nurse Practitioner Bakewell.  (UDF ##
26  7, 8; Hampton Decl. ¶ 6, UDF # 27 & Bakewell Decl. ¶¶ 6 & 8.)

1   proper medical treatment, is sufficient to violate the Eighth Amendment.  See Estelle, 429 U.S. at

2   105-06; Wakefield, 177 F.3d at 1165; see also Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.

3   1989).

4          First, as to defendant Swett, plaintiff has provided no evidence that defendant

5   Swett was responsible for addressing inmates' gestures from their cells.  Rather, it is undisputed

6   that correctional officers manning the control booth generally provide gun coverage and monitor

7   and control access and egress for staff and inmates to and from the building.  (Id.)

8          Second, plaintiff has provided no evidence that defendant Swett was aware

9   plaintiff was attempting to contact him because of a medical problem.  Plaintiff states that Swett

10  saw him, but he does not allege he made Swett aware he was suffering from a medical problem.

11  In his opposition, plaintiff states that flashing cell lights signifies one needs attention because of

12  a "problem (immediate)," (Dkt. No. 24 at 3), but does not explain how Swett would interpret

13  light flashing or waving as demonstrating a medical problem.  Plaintiff also failed to provide

14  evidence that Swett was responsible for responding to such attempts in any event.  Without

15  evidence that Swett was deliberately indifferent to plaintiff's serious medical needs, Swett cannot

16  be held liable for a delay in obtaining medical treatment for plaintiff.

17         As to defendant Hampton, it is undisputed that Hampton refused to call for

18  medical assistance when he arrived at plaintiff's cell for cell count based on his belief that

19  plaintiff was strong enough to board-up and did not appear in immediate distress.  Plaintiff has

20  not demonstrated that Hampton intentionally ignored plaintiff's medical complaints; rather, it is

21  undisputed that Hampton informed plaintiff he could wait until yard to present his complaints at

22  the gate.  These facts do not support a finding that Hampton's alleged indifference was

23  substantial inasmuch as yard release would occur shortly after Hampton conducted the cell count,

24  which would take 10 to 15 minutes.  A 15-minute delay does not state a cognizable Eighth

25  Amendment violation.  See Estelle, 429 U.S. at 105-06.

26  ////

1    Moreover, once Hampton became aware plaintiff was laying on the tier, it is

2 undisputed he called for medical assistance, which arrived shortly after plaintiff was returned to

3 his cell after being removed from the tier.  Sometime after 11:00 a.m., plaintiff was examined by

4 Nurse Asp.  Plaintiff was seen in the clinic at 12:00 p.m.  (Compl., at 13.)  Vitals were taken

5 again at 12:30 p.m.  (Id.)  By 1:00 p.m., plaintiff was seen by Nurse Practitioner Bakewell.

6 These facts also do not support a finding that defendant Hampton intentionally delayed medical

7 care based on deliberate indifference.  And, given the treatment plaintiff received at clinic, the

8 one and-a-half to two-hour delay in receiving medical treatment does not constitute an Eighth

9 Amendment violation.

10    Finally, mere delay in treatment, without more, is insufficient to state a claim of

11 deliberate indifference.  Plaintiff avers that he might have suffered from a heart attack.  Plaintiff

12 states he has a history of arrhythmia, and that he thought he was dying.  (Dkt. No. 24 at 38.)

13 However, these claims are speculative, particularly in light of the normal EKG and other test

14 results obtained at the clinic on May 21, 2008.  Plaintiff has failed to demonstrate he was

15 seriously harmed by the one and-a-half to two-hour delay.  See McGuckin v. Smith, 974 F.2d

16 1050, 1060 (9th Cir.1992); see also Hallett v. Morgan, 287 F.3d 1193, 1206 (9th Cir. 2002)

17 (The Eighth Amendment is only violated if "delays occurred to a patient with problems so severe

18 that delays would cause significant harm that defendants should have known. . . .")  Here,

19 medical staff did not take any steps to prevent plaintiff from fainting in the future.  They did not

20 prescribe him any medication for syncope.  They prescribed him Motrin for the pain, which

21 suggests his pain level did not require narcotics.  Earlier presentation at the clinic would not have

22 changed the outcome here.

23    Plaintiff argues that the fact he was referred for more medical tests, ultimately

24 being seen by specialists at the University of California at Davis, demonstrates plaintiff had an

25 existing condition that had the potential to be life-threatening.  (Dkt. No. 24 at 59.)  However,

26 plaintiff has failed to provide competent evidence supporting this claim.  There is nothing in

19

1    Dr. Miles' letters indicating that the syncopal episodes were life-threatening. (Dkt. No. 24 at 93,

2    95.) More importantly, the battery of tests and the referral to experts outside the prison

3    demonstrates that prison officials provided plaintiff with adequate medical care.

4         Plaintiff has failed to demonstrate that the one and-a-half or two-hour delay in

5    obtaining medical care violated his Eighth Amendment rights. Given the undisputed facts, no

6    reasonable jury could find that defendants violated plaintiff's Eighth Amendment rights.

7         In light of the above, defendants' cross-motion for summary judgment should be

8    granted and plaintiff's motion for summary judgment should be denied.

9    VII. Qualified Immunity

10        Because the court has found that the conduct alleged by plaintiff does not state a

11   constitutional deprivation, the court need not address defendants' arguments for qualified

12   immunity.

13        IT IS HEREBY RECOMMENDED that:

14        1. Defendants' February 18, 2010 cross-motion for summary judgment, Dkt

15   No. 21, be granted as to both defendants and this case be closed; and

16        2. Plaintiff's December 29, 2009 motion for summary judgment, Dkt. No. 16, be

17   denied.

18        These findings and recommendations are submitted to the United States District

19   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-

20   one days after being served with these findings and recommendations, any party may file written

21   objections with the court and serve a copy on all parties. Such a document should be captioned

22   "Objections to Magistrate Judge's Findings and Recommendations." Any response to the

23   objections shall be filed and served within fourteen days after service of the objections. The

24   ////

25   ////

26   ////

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  July 23, 2010

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

hamm0920.msj

21